DEMICA D. HAWKINS,       )
                             )
      Plaintiff,          )       **Case No. 3:12-cv-1125**
                             )       **Judge Aleta A. Trauger**
v.                         )
                             )
THE CENTER FOR SPINAL SURGERY,   )
                             )
      Defendant,         )

## MEMORANDUM

The defendant has filed a Renewed Motion for Summary Judgment (Docket No. 76), to which the plaintiff, Demica Hawkins, has filed a Response in opposition (Docket No. 87), and the defendant has filed a Reply (Docket No. 93). Hawkins also filed a Partial Motion for Summary Judgment on the Issue of Interference with Plaintiff's Family and Medical Leave Act Rights (Docket No. 73), to which the defendant filed a Response in opposition (Docket No. 91), and the plaintiff filed a Reply (Docket No. 98).[1] For the reasons explained herein, only Hawkins' retaliatory discharge and FMLA interference claims related to her termination will proceed to trial.

## BACKGROUND

The Center for Spinal Surgery ("CSS" or "the hospital") hired Hawkins, who is black, as an Accounts Payable Coordinator within its Business Department in February 2009.[2] Hawkins

---

[1] Hawkins initially filed her Partial Motion for Summary Judgment without the requisite leave of court. The court granted Hawkins' subsequent Motion for Leave to file that motion (Docket No. 99), which retroactively corrected this error.

[2] CSS's name has changed since the initiation of this lawsuit. For ease of reference, both parties continue to refer to the company as "CSS."

was employed in this role at CSS through March 1, 2013. Hawkins alleges that, during and after her period of employment, CSS discriminated against her on the basis of race, retaliated against her multiple times for bringing discrimination or retaliation charges against CSS, and discriminated or retaliated against her for taking pregnancy leave.

## I. July 2010 Alleged Pay Discrimination and the Associated First EEOC Charge

When Hawkins was hired, she became responsible for all functions related to accounts payable ("A/P") for the hospital. She was paid at a rate of $20.00 per hour, which amounted to approximately $40,000.00 per year. In April or May 2009, CSS approached Hawkins to add some human resource and payroll functions to her workload, apparently as part of a change in ownership and in anticipation of a national accreditation survey for the hospital. Other employees at the hospital similarly took on additional responsibilities for the same reasons. Hawkins performed the additional functions (along with her A/P responsibilities) without incident through approximately August 2010. The accreditation survey took place in June 2010 and CSS received the accreditation.

On July 7, 2010, Hawkins met with Kathy Watson, the Administrator in Chief of Nursing for CSS, to discuss her job duties and compensation. Based on research she had done regarding jobs in the middle Tennessee area, Hawkins asked Watson for a $20,000 pay raise because she believed she was doing "too much" and was entitled to more money going forward. (*see* Watson Dep. Vol. I at 161:24-162:3.) Watson was polite, listened attentively, told Hawkins that she was doing a good job, and told Hawkins that she would speak with Corey Ridgway, CSS's President, about the possibility of a raise. Watson spoke with Ridgway, who decided to deny Hawkins the requested raise. Rather than giving her a raise, Watson reassigned Hawkins' non-A/P duties

(human resources and payroll) to three white employees: Director of Finance Angie Crow and Business Office Manager Alissa Christiansen (who took on the human resources functions), and Lindsey Patterson (who took on the payroll functions). Watson claims that she did so to address Hawkins' "complaints" about her existing workload. By contrast, Hawkins contends that Watson was seeking to avoid giving a pay raise to Hawkins because she is black. It is undisputed that neither Christian nor Crow received a pay raise for assuming Hawkins' human resource functions. As to Patterson, it is undisputed that she received a $1.00 pay raise, although the basis for the raise is disputed. Patterson was hired on May 17, 2010 as a probationary employee in the Business Office (the same office in which Hawkins worked), earning $16.00 per hour. On June 28, 2010, Patterson's probationary period ended and she became a full-time employee. After becoming a full-time employee, Patterson received a $1.00 raise (to $17.00 per hour) at approximately the same time that she assumed the payroll work that Hawkins had been performing. According to Watson's declaration, Patterson received the raise simply because she switched to full-time work, although Watson admitted at deposition that not every PRN employee receives a raise upon the completion of their probationary period.

In addition to the alleged differential wage treatment relative to Patterson, Watson contends that she was "similarly situated" to four other white employees who (1) had taken on additional responsibilities in the spring and summer of 2010 in the context of the hospital's accreditation and certification, (2) requested wage increases from Watson following the certification, and (3) received the requested wage increases.[3] The circumstances of these four employees are as follows:

_____

[3] With respect to these four employees, Hawkins' brief and supporting factual statement provide no additional details, such as their position, the nature of the wage increase requests, or any other

- Judy Statham works in the Nursing Department and was promoted from a Charge Nurse to Nurse Manager. Her promotion carried with it an increase in pay. As the Nurse Manager, Statham is responsible for all nursing functions throughout the facility and supervises all staff in Pre-op, Post Anesthesia Care Unit, and Pre-Admission Testing.

- Toni Walker also works in the Nursing Department and was promoted from Nurse to Clinical Educator. Her promotion carried with it an increase in pay. As the Clinical Nurse Educator, Walker is responsible for evaluating patient care and facilitating the professional development of the nursing staff.

- Stephanie Purtee works in the Quality Management Department and was promoted from Quality Manager to Quality Director. Her promotion carried with it an increase in pay. As the Quality Director, Purtee is responsible for planning, organizing, coordinating, and evaluating the activities and functions of performance improvement, risk management, infection control, and special projects.

- Yanci Pence works in the Nursing Department as an Operating Room RN, and occasionally fills in as Charge Nurse. The Charge Nurses are responsible for patient care and were provided a pay raise from $1.50 to

---

contextual circumstances. By contrast, in support of its Renewed Motion for Summary Judgment, CSS relies on a declaration from Kathy Watson, in which Watson provides some of these details. Based on inconsistencies among Watson's sworn statements in this case (described in more detail herein), Hawkins contends that nothing Watson avers in support of the summary judgment motion should be given any evidentiary weight and, based on that assumption, she purports to "dispute" every factual representation related to these four employees on that basis alone. However, Hawkins points to no evidence that contradicts Watson's declaration as it relates to these four employees, even though it is incumbent upon her to do so to establish a genuine dispute of material fact. Moreover, at her deposition, Hawkins actually *admitted* some of the facts that she now purports to dispute regarding these employees. (*See* Hawkins Dep. Vol I. at 168:4-169:1 (admitting, *inter alia*, that Statham is the Nurse Manager and that Walker is a Nurse Educator).) Thus, at least in part, Hawkins is essentially asking the court to treat Watson as testifying untruthfully relative to facts that Hawkins testified are actually true. Under the circumstances, it would be inappropriate (and illogical) for the court to assume for purposes of the motion that, with respect to facts concerning these four potential comparators specifically, every asserted fact is subject to a "genuine dispute." In reality, the facts concerning these comparators are unrebutted.

$3.00 an hour because, according to Watson, "a pay adjustment was long overdue."[4]

On November 8, 2010, Hawkins filed an EEOC charge related to the July 2010 incident (the "First EEOC Charge"), alleging race discrimination.

## II.     Alleged Retaliation for the First EEOC Charge

Hawkins contends that, shortly after filing the First EEOC Charge, CSS retaliated against her by writing her up for three workplace mistakes that occurred in December 2010 and January 2011.

First, in late December 2010, Hawkins accidentally overpaid a vendor by approximately $4,000. According to Watson, she (Watson) discovered the overpayment and verbally coached Hawkins. According to Hawkins, she (Hawkins) discovered the issue herself, corrected it, and self-reported to Watson both the issue and the means by which she resolved it. It is undisputed that Watson did not immediately write up Hawkins for the issue at the time. Second, in December 2010 or January 2011,[5] Hawkins mistakenly entered an invoice into the hospital A/P software without obtaining the requisite approval from either Crow or Watson. Crow verbally counseled Watson for this mistake. According to Hawkins, Crow or Watson was equally culpable for this mistake, because Hawkins only inputted invoices after receiving them back from Crow or Watson (with their signature), meaning that Crow or Watson must have returned

---

[4] In Hawkins' opposition brief, she also states that she "has listed" an individual named Lori Marlar as a comparator, although neither she nor CSS references any specifics concerning Ms. Marlar.

[5] Although Watson avers that Crow discovered this issue on December 2, 2010 (presumably before the vendor overpayment issue), CSS does not dispute Hawkins' position that the incident occurred either in December 2010 or January 2011. (*See* Docket No. 94, CSS Response to Fact No. 14.) Thus, it is not entirely clear whether the incident occurred before or after the vendor overpayment issue. The order of these two incidents is not material.

the invoice to Watson without signing it as they should have.[6]  Third, in January 2011, Hawkins

failed to close the hospital's accounts payable for that month.  Hawkins had asked to take the day

off on the date the accounts were closing (January 28, 2011) and had told Crow and Christiansen

that she would close the accounts before her vacation day.  Hawkins in fact failed to close the

accounts before her vacation day.  After Crow learned that certain A/P errors had not been

corrected and that Hawkins had failed to close the A/P account period, Crow corrected the errors

and closed the A/P account period herself.  Although Hawkins had told Crow and Christiansen to

call her with any issues, no one contacted her that day.

On February 2, 2011, Christiansen and Crow issued an Employee Counseling Report

("ECR") to Hawkins relating to the three incidents.[7]  According to Crow and Watson, they

believed it was necessary to issue the ECR because Hawkins had made several errors in a

relatively short time frame, the last of which was the most serious.  Hawkins refused to sign the

ECR, although she acknowledges that she made all three mistakes referenced in it.  At

---

[6] This was not Hawkins' position at deposition.  At her deposition, Hawkins essentially testified
that it was fine to make this mistake because mistakes of that nature were within the "margin of
error" for the A/P position.  Perhaps recognizing that this position is untenable, her declaration
completely re-characterizes the issue as one of differential treatment relative to Crow and
Watson.

[7] At deposition, Hawkins testified that the ECR that Crow and Christiansen issued to her related
to all three incidents.  (Hawkins Dep. Vol. I at 111:3-14.) In her affidavit filed in support of her
opposition brief, Hawkins now claims that the report initially related only to *two* of the incidents
and that someone (perhaps Watson) added the third issue (relating to the vendor overcharge) at a
later point in time.  (Hawkins Decl. ¶ 21.)  Neither side appears to have filed a copy of the actual
ECR.  At any rate, Hawkins cannot create genuine disputes of fact by contradicting her own prior
deposition testimony in an effort to defeat summary judgment.  *See Aerel, S.R.L. v. PCC Airfoils,
L.L.C.*, 448 F.3d 899, 906-907 (6th Cir. 2006); *Penny v. United Parcel Serv.*, 128 F.3d 408, 415
(6th Cir. 1997); *Red v. Sears, Roebuck, & Co.*, 790 F.2d 453, 460 (6th Cir. 1986).  Accordingly,
because Hawkins attempts to contradict her prior deposition in an apparent attempt to defeat
summary judgment, the court will not rely on her affidavit as to that stated fact.

deposition, Hawkins contended that she believed that her supervisors were retaliating against her by issuing the ECR, because the mistakes were "common" and fell within the "margin of error" for her company. However, in her briefing here, she does not identify any comparators related to the mistakes for which she received the ECR.

Notwithstanding receipt of the ECR, Hawkins was not terminated or suspended. In fact, she received a favorable performance review in February 2011, and she received an annual wage increase of three percent.

### III. Second EEOC Charge and Alleged Retaliation Relative to that Charge

At an unspecified point after she received the February 2, 2011 ECR, Hawkins filed another EEOC charge against CSS (the "Second EEOC Charge"), alleging that CSS had retaliated against her for filing the First EEOC Charge.[8] Hawkins alleges that, soon after she filed the Second EEOC Charge, she suffered "other forms of petty retaliation." She provides only one specific example. In February 2012, Watson asked Troy Raymer, a CSS maintenance employee, to check whether Hawkins was using a space heater that did not comply with company policy. Raymer determined that Hawkins in fact was using a space heater that was not hospital grade and informed Watson, who told him to inform Hawkins that the space heater was not permitted. Raymer then told Watson that other employees also had non-compliant space heaters. Watson told Raymer to have those employees remove their space heaters as well.

### IV. EEOC Findings, this Lawsuit, and Allegedly Retaliatory Termination

---

[8] Neither party has filed a copy of the Second EEOC Charge, nor has the court located any reference in the record to the specific date on which Hawkins filed it with the EEOC. As best the court can tell, Hawkins filed that charge sometime between February 2, 2011 and July 31, 2011.

On July 31, 2011, the EEOC ruled on Hawkins' First EEOC Charge, finding reasonable cause to believe that CSS had discriminated against her in the manner in which her raise request was handled. On October 30, 2012, Hawkins filed this lawsuit. Her original Complaint asserted claims of discrimination (the subject of the First EEOC Charge) and retaliation (relative to CSS's actions followed the First and Second EEOC Charges).

At the time Hawkins filed this lawsuit, she was in the third trimester of pregnancy. She accordingly filed for and received FMLA leave from CSS, and Hawkins began her leave on December 12, 2012, with a presumptive return date of March 1, 2013. On January 28, 2013, Hawkins received a letter from Watson, informing her that her position was being eliminated. In Watson's letter, Watson stated that the hospital was implementing a new electronic health records system, that Hawkins' Accounts Payable function was no longer needed under the new system, that all twelve of the sister hospitals were impacted by the changes, that CSS was transferring its revenue cycle functions to a facility in Addison, Texas (the USPI home office), and that at least two other positions within CSS's business office were also being eliminated as part of the transition.

Hawkins and CSS dispute whether Watson's representations were genuine. Hawkins contends that Watson in fact either (1) sought to retaliate against her for filing EEOC Charges and bringing this lawsuit, or (2) interfered with her right to return to her job at the conclusion of the FMLA leave. As Hawkins points out in her opposition brief and in her Memorandum in support of her Partial Motion for Summary Judgment, the record contains remarkable inconsistencies concerning the purported factual basis for her termination, which the court incorporates by reference. (*See* Docket No. 87 at pp. 8-16.) Briefly, Ridgway (CSS's President) claimed to have personal knowledge of facts concerning the transition in the electronic health

records system as it affected CSS and its sister hospitals, including the fact that Hawkins'
position (along with two others) was "eliminated" as part of the transition. However, at
deposition (in both his personal capacity and as a designated Rule 30(b)(6) witness), Ridgway
disclaimed any personal knowledge as to how the sister hospitals implemented the new system
and stated that he had no personal knowledge that Hawkins' position was eliminated. Ridgway
also admitted that Josh Landis performed the hospital's A/P function (as well as other work)
while Hawkins was on maternity leave, and that an employee named Vickie Harrington assumed
the A/P function (in addition to other work) after Landis left the company in the second half of
2013.[9]  In discovery, consistent with her January 28, 2013 termination letter to Hawkins, Watson
signed interrogatory responses stating that Hawkins' position was "eliminated" as part of the
structural reorganization and that CSS transferred most of its A/P functions to USPI's Texas
office. However, during her deposition, Watson admitted that the A/P position and the A/P
function *were not in fact eliminated*, and that Watson knew it was not going to be eliminated at
least as of March 2013.

Furthermore, Watson and Ridgway now maintain that Gale Gonzalez, a USPI Senior
Vice President, told CSS that its A/P functions would be transferred to Texas as part of the
transition, which is why Watson included that representation in the January 28, 2013 termination
letter to Hawkins. However, Gonzalez testified that, although she may have recommended to
Watson and Ridgway that CSS transfer its A/P functions to Texas, she never would have made
that decision for CSS and never would have told Watson and Ridgway that the A/P position
necessarily was being eliminated, because that decision was for Watson and Ridgway to make.

---

[9] The record contains evidence that Landis was the boyfriend of Watson's daughter at the time.

Furthermore, Tracey Barkley, USPI's Accounts Payable Director, was not aware of any expectation that A/P functions would be transferred to the Texas office.

At any rate, a few other relevant events occurred in the same time frame. The positions held by two white employees, Harrington and Joyce Cooper, were being eliminated as part of the transition. Gonzalez flew from the USPI office in Texas to meet with both Harrington and Cooper. During those meetings, Gonzalez offered Harrington and Cooper other positions at CSS. By contrast, Gonzalez did not meet with Hawkins or offer her another position at the company.

## V.     Remaining Claims

Following her termination, Hawkins filed an Amended Complaint that includes claims for retaliation and discrimination under Title VII, § 1981, and the THRA, a claim under the Pregnancy Discrimination Act ("PDA"), and an interference claim under the FMLA. Notably, Hawkins did not file a charge with the EEOC alleging pregnancy discrimination before alleging that claim in her Second Amended Complaint.[10]

## RULE 56 STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the

---

[10] Earlier in this case, Hawkins was represented by another attorney. It appears that Hawkins' prior counsel was deficient in prosecuting Hawkins' claims, by failing to conduct discovery and dragging his feet in response to directives from the court. After CSS moved for summary judgment on Hawkins' claims, Hawkins retained new counsel, who appeared and requested leave to conduct the requisite discovery. The court granted the request and the parties engaged in additional discovery, much of which is now part of the record before the court.

plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

"On cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012) (internal quotation marks and brackets omitted).

## ANALYSIS

### I. Pregnancy Discrimination Act Claim

In 1978, Congress amended Title VII to add the Pregnancy Discrimination Act, which stated that "women affected by pregnancy . . . shall be treated the same for all employment-related purposes as other persons not so affected but similar in their ability or inability to work." *See Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466 (6th Cir. 2005) (quoting 42

U.S.C. § 2000e(k)).[11]  A person seeking to bring a discrimination claim under Title VII in federal court must first exhaust administrative remedies.  *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006).  "This requirement exists so that the EEOC will have an opportunity to convince the parties to enter into voluntary settlement, which is the preferred means of disposing of such claims."  *Id.*; *see also Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) ("The purpose of the requirement is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation.")  "The requirement, however, is not meant to be overly rigid, nor should it result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading."  *Randolph*, 453 F.3d at 732 (internal quotation omitted).

Within the Sixth Circuit, the general rule is that "the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination."  *Dixon*, 392 F.3d at 217 (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367 (6th Cir. 2002)); *see also Bray v. Palm Beach Co.*, 1990 WL 92672, at *2 (6th Cir. June 29, 1990) (finding that "the facts alleged in the body of the EEOC charge, rather than merely the boxes that are marked on the charge, are the major determinants of the scope of the charge").  Under this rule, the Sixth Circuit "has recognized that[,] 'where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff

_____

[11] A claim under the PDA is a type of Title VII discrimination claim.  For ease of reference only – to distinguish it from her other Title VII claims – the court will generally refer to Hawkins' Title VII claim under the PDA as a "PDA claim."

is not precluded from bringing suit on that claim.'" *Dixon*, 392 F.3d at 217 (quoting *Weigel*, 302 F.3d at 380)).

Here, CSS argues that Hawkins' PDA claim should be dismissed because she did not file an EEOC charge asserting this claim. Here, Hawkins argues that the EEOC would have been prompted to investigate her pregnancy discrimination claim because she filed a retaliation claim with the EEOC. Hawkins' position defies logic. Hawkins filed her retaliation charges with the EEOC *before* she became pregnant. Thus, none of her discrimination or retaliation charges put the EEOC on notice to investigate whether CSS discriminated against her on the basis of pregnancy. Indeed, it appears that the first time Hawkins raised a pregnancy discrimination claim was in her Second Amended Complaint, filed on December 13, 2013.

Therefore, the court finds no basis to conclude that either charge would have spurred the EEOC to investigate the possibility of pregnancy discrimination by CSS. The EEOC did not have the opportunity to address this claim and to attempt to resolve it to avoid litigation. Hawkins therefore failed to exhaust her administrative remedies and the PDA claim must be dismissed.

## II. Discrimination Claims

### A. Preliminary Matters

#### 1. Single-Motive and Mixed-Motive Discrimination Claims

Under 42 U.S.C. § 2000e-2(a)(1), an employer may "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his terms, conditions, or privileges of employment, because of such individual's race . . . ." Under 42 U.S.C. § 2000e-2(m), "an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even

though other factors also motivated the practice." Allegations of discriminatory conduct therefore fall into one of two categories: single-motive claims, where an illegitimate reason motivated an employment decision (actionable under § 2000e-2(a)(1)), or  claims, where both legitimate and illegitimate reasons motivated the employer's decision. *Spees v. James Marine, Inc.*, 617 F.3d 380, 389-90 (6th Cir. 2010).

In *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008), the Sixth Circuit held that the *McDonnell Douglas* framework applies to single-motive claims but does not apply to mixed-motive claims. With respect to mixed-motive claims, "a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion,, sex, or national original was *a* motivating factor for the defendant's adverse employment action." *White*, 533 F.3d at 400 (emphasis in original) (citation and internal quotation marks omitted). The plaintiff's burden of producing evidence to support a mixed-motive claim is "not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.* "Although portions of the *McDonnell Douglas/Burdine* framework might be 'useful' in presenting a mixed-motive claim, the *White* court made clear that 'compliance with the . . . shifting burdens of production is *not* required in order to demonstrate that the defendant's adverse employment action was motivated in part by a consideration of the plaintiff's race . . . .'" *Spees*, 617 F.3d at 390 (citing *White*, 533 F.3d at 401). The "ultimate question in a mixed-motive analysis is simply whether there are any genuine issues of material fact concerning the defendant's motivation for its adverse employment decision, and, if none are present, whether the law supports a judgment in favor of the moving party on the basis of the undisputed facts." *Spees*, 617 F.3d at 390. Inquiries into what

motivated an employer's decision "are very fact intensive" and "will generally be difficult to determine at the summary judgment stage." *Id*.[12] Finally, "[a] plaintiff triggers a mixed-motive analysis by giving notice of bringing such claims." *Id*.; *see also Bartlett v. Gates*, 421 F. App'x 485, 488 n.1 (6th Cir. 2010).

Here, in Hawkins' response to CSS's Motion for Summary Judgment, Hawkins argues that CSS's motion should fail because CSS did not explain why her claims would fail under a "mixed-motive" theory of liability (as opposed to a single-motive claim governed at the Rule 56 stage by the *McDonnell Douglas* standard). Hawkins' position is disingenuous: until her opposition brief, CSS had no notice that Hawkins was pursuing a mixed-motive claim. Her original Complaint alleged only claims for retaliation. In the Initial Case Management Order, the plaintiff asserted only a retaliation claim in her summary of her theory of the case. (*See* Docket 15.) In her First Amended Complaint, she asserted discrimination claims for the first time, alleging that CSS had discriminated against her by treating her differently than similarly situated employees outside her protected class. (Docket No. 16.) Similarly, her Second Amended Complaint (filed by her current counsel) alleged discrimination based on differential treatment relative to similarly situated employees outside her protected class. (Docket No. 63.) Although the First and Second Amended Complaints do not reference the specific Title VII provision(s) underlying her discrimination claims, the allegations about differential treatment (relative to

---

[12] The relatively lenient summary judgment standard for mixed-motive claims "is counterbalanced by potential restrictions on a plaintiff's recovery" under a mixed-motive claim. *Spees*, 617 F.3d at 390. If a plaintiff proves that race was a motivating factor for an adverse employment action (thereby proving her mixed-motive claim), but the employer also proves, in response, that it "would have taken the same action in the absence of the impermissible motivating factor," the plaintiff's recovery is limited to (1) declaratory relief, (2) injunctive relief, and (3) attorney's fees and costs demonstrated to be "directly attributable only to the pursuit of a claim under § 2000e-2(m)." 42 U.S.C. § 2000e-5.

similarly situated employees outside her class) relate to a single-motive claim, for which comparators would be necessary at the Rule 56 stage later in the case. At any rate, Hawkins nowhere stated that she was pursuing a mixed-motive claim, that she was specifically making a claim under § 2000e-2(m), or that she believed race was "*a* motivating factor" for her termination, rather than the single motive for her termination. Thus, CSS cannot be faulted for addressing only a single-motive claim in its opening summary judgment brief.

Hawkins' response brief is, in relevant part, somewhat vague as it relates to a mixed-motive analysis. She contends that, "even if there is a modicum of truth to defendant's claim that there was nothing either discriminatory or retaliatory in its decision to a) discipline Ms. Hawkins in early 2011, or b) terminate her in January 2013, the Defendant is still not entitled to summary judgment, because it cannot, and has not attempted to, show that it is entitled to such judgment under a  theory." (Docket No. 87 at p. 24.) In the next two paragraphs, Hawkins' brief recites the *White* standard and simply states as follows: "Here, Defendant has not even asked the court to grant summary judgment under a  theory. But even if it had, all the evidence above in support of Plaintiff under a single motivation theory would apply, and accordingly, the motion should be denied." (*Id.*) The brief contains no explanation as to how *White* specifically applies to the polyglot of facts and incidents relating to Hawkins' claims in this case.

Given that the relevant section of Hawkins' brief identifies only the 2011 ECR and the January 2013 termination (*see* Docket No. 87 at p. 24), the court construes Hawkins (albeit generously) as arguing for the application of the mixed-motive analysis to her claims as they relate to those two specific incidents. Importantly, she asserts only *retaliation* claims relative to those two incidents; her discrimination claim (Count I) is limited to the July 2010 incident. In the Supreme Court's recent decision in *Nassar*, the Court found that § 2000e-2(m) does not

apply to retaliation claims. *See* 133 S.Ct. at 2528 ("The text of 2000e-2(m) says nothing about retaliation claims. Given this clear language, it would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope.") Therefore, without further analysis, Hawkins' argument that her Title VII retaliation claims may proceed as "mixed-motive" claims is a non-starter.[13]

Accordingly, the court will analyze Hawkins' Title VII claims under the *McDonnell Douglas* standard. For purposes of the motion, Hawkins has not contested that her § 1981 claims are subject to same analysis. *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 756 (6th Cir. 2012).

2. THRA Claims

With respect to her THRA claims, Hawkins appears to argue that the court should apply the lenient summary judgment articulated by the Tennessee Supreme Court in *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 785 (Tenn. 2010), relative to Tennessee common law retaliatory discharge claims. There, construing Tenn. R. Civ. P. 56.04 and Tennessee jurisprudence concerning the means of showing that there is "no genuine issue of material fact" for trial, the Tennessee Supreme Court found that the *McDonnell Douglas* framework was not consistent with Tenn. R. Civ. P. 56.04 at it applied to Tennessee common law retaliation claims, because it could

---

[13] The court also notes that there is some tension within the Sixth Circuit's jurisprudence concerning whether a plaintiff may pursue a "mixed-motive" claim under § 1981. *See Williams v Zurz*, 503 F. App'x 367, 376 (6th Cir. 2012) (noting potential tension between *Aquino v. Honda of Am., Inc.*, 158 F. App'x 667, 676 (6th Cir. 2005), and *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 757 (6th Cir. 2012)). Here, the issue is only referenced in a single paragraph in the defendant's Reply, and the court need not reach the issue in any case. The court simply notes that the district court's analysis in *Francis v. Davis H. Elliot Constr. Co.*, 2013 WL 941527, at *7 (S.D. Ohio Mar. 11, 2013), offers a persuasive explanation as to why mixed-motive claims are not available under § 1981. *See also Aquino*, 158 F. App'x at 667 n. 5 ("Congress could have added a 'mixed motive' option for lawsuits under § 1981 but lawmakers evidently chose not to do so.")

result in "trial courts disposing of factual questions on summary judgment." *Id*. at 782-83. The court was highly critical of the *McDonnell Douglas* approach, which it believed "could result in the grant of a summary judgment despite the presence of genuine issues of material fact." *Id.* at 783. In sum, the court held that "the *McDonnell Douglas* framework is inapplicable at the summary judgment stage because it is incompatible with Tennessee summary judgment jurisprudence." *Id.* In 2011, the Tennessee legislature effectively abrogated *Gossett* by passing Tenn. Code Ann. § 4-21-311(e), which reinstated the *McDonnell Douglas* framework for THRA claims that accrued on or after June 10, 2011. *See* 2011 Public Act Ch. 461 § 4.

Here, Hawkins suggests that the Tennessee legislature might have "unconstitutionally infringed on the prerogatives of the judicial branch" when it passed § 311(e). It is not clear whether Hawkins is referencing the United States Constitution or the Tennessee Constitution (or both), and Hawkins does not meaningfully argue this point. Hawkins also points out that, even assuming that § 311(e) is valid, it does not apply to her claim for retaliation related to the early 2011 ECR, which accrued before June 10, 2011 (the effective date of § 311). Although she does not explain the relevance of this distinction any further, she seems to be arguing that, with respect to her THRA retaliation claim concerning the February 2011 ECR, this court should apply the more lenient summary judgment standard articulated by the Tennessee Supreme Court in *Gossett*, rather than the *McDonnell Douglas* standard. Hawkins does not cite any cases in which a federal district court has applied *Gossett* to a THRA claim that accrued before June 10, 2011.

Although few courts have been required to address the issue directly, the Sixth Circuit and several district courts have characterized *Gossett* as ruling on a matter of state procedural law, meaning that its holding is inapplicable to motions brought under the Federal Rules of Civil

18

Procedure.  *See Theus v. GlaxoSmithKline*, 452 F. App'x 596, 692 n.8 (6th Cir. 2011) (assuming for purposes of appeal that *Gossett* stated a procedural rule); *Banks v. Argos Risk Mgmt. Servs., LLC*, 963 F. Supp. 2d 778, 786 n.7 (M.D. Tenn. 2013); *Moling v. O'Reilly Auto., Inc.*, 763 F. Supp. 2d 956, 974-78 (W.D. Tenn. 2011); *Reed v. Inland Intermodal Logistics Servs., LLC*, 2011 WL 4565450, at *5-*7 (W.D. Tenn. Sept. 29, 2011); *Campbell v. Eagle Bend Mfg., Inc.*, 2011 WL 2471493, at *6 n.2 (E.D. Tenn. June 22, 2011); *see also Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 333 (6th Cir. 2012); *Blackburn v. Shelby Cnty.*, 770 F. Supp. 2d 896, 933-34 (W.D. Tenn. 2011); *Atkins v. Denso Mfg. Tenn., Inc.*, 2011 WL 5023392, at *15-*16 (E.D. Tenn. Oct. 20, 2011) (collecting cases).[14]  For the reasons explained in exacting detail in *Moling*, which are incorporated by reference herein, this court agrees and finds that *Gossett* articulated a procedural rule that does not impact this court's analysis of THRA claims that accrued before the effective date of § 311.  Therefore, this court will apply the *McDonnell Douglas* framework to Hawkins' THRA claim at it relates to the February 2011 ECR.

The court expresses no opinion concerning the "constitutionality" of § 311(e) under the federal Constitution or the Tennessee Constitution, which Hawkins has not meaningfully argued in her brief.  The court will apply the *McDonnell Douglas* framework to Hawkins' remaining THRA claims – which accrued after June 10, 2011 – because, for the reasons stated in the previous paragraph, the summary judgment burdens are governed by federal procedural law.

---

[14] In several cases, the Sixth Circuit has noted the issue but explicitly declined to decide it.  *See, e.g.*, *Cobb v. Keytone Memphis, LLC*, 526 F. App'x 623, 627-28 (6th Cir. 2013); *Webb v. ServiceMaster BSC LLC*, 438 F. App'x 451, 455 (6th Cir. 2011).  This court also notes that some courts have held that *Gossett* only applied to Tennessee *common law* retaliatory discharge claims, not THRA claims.  *See, e.g.*, *Philip Wrigley Mfg. Co.*, *LLC*, 2010 WL 4318880, at *11 n.5 (E.D. Tenn. Oct. 22, 2010).

Regardless, even assuming *arguendo* that § 311 binds this court, it would require application of the *McDonnell Douglas* standard to those post-June 2011 claims.

### 3. Summary

The court will apply the *McDonnell Douglas* framework to Hawkins' race discrimination and retaliation claims under Title VII, § 1981, and the THRA.

### B. Alleged Overtime Discrimination

Hawkins has not addressed or otherwise opposed CSS's argument that her alleged discriminatory treatment as it relates to overtime must be dismissed. The court construes Hawkins as having abandoned this basis for a discrimination claim and will analyze only the alleged discrimination in pay stemming from the July 2010 incident.

### C. Alleged Pay Discrimination in July 2010

Hawkins relies on circumstantial evidence of race discrimination, which requires application of the *McDonnell Douglas* burden-shifting analysis. Hawkins must first make out a *prima facie* case of discrimination by showing that (1) she engaged in protected activity; (2) the employer knew of the exercise of the protected right; (3) an adverse employment action was subsequently taken against her; and (4) there was a causal connection between the protected activity and the adverse employment action. Once this showing is made, the defendant must articulate a legitimate, nondiscriminatory reason for its decision through the introduction of admissible evidence. If the defendant meets this burden of production, the burden then "shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). To make this showing, Hawkins retains the ultimate burden to produce "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer the [the defendant]

intentionally discriminated against [her]." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).

With respect to her *prima facie* case, CSS argues that Hawkins has not identified a "similarly situated" white employee who was treated more favorably than she. "In order to be considered 'similarly situated' for the purposes of comparison, the employment situation of the comparator must be similar to that of the plaintiff in all relevant aspects." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 837 (6th Cir. 2012). For cases involving differential disciplinary action, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). In cases that involve alleged differential treatment other than disciplinary action – as here – "[c]ourts should not assume [] that the specific factors in *Mitchell* are relevant factors in cases arising under different circumstances[.]" *Ercegovich*, 154 F.3d at 352. Instead, courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employees." *Id.* In that context, "[t]he plaintiff need not demonstrate an exact correction with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated;' rather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects'." *Id.* (quoting *Pierce v. Commwlth*, *Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)) (emphasis in original).

Here, as best the court understands the claim, Hawkins contends that she should have received the $20,000 raise she requested in July 2010, and that Ridgway and Watson's decision to deny the raise and distribute her work to white employees was based on her race rather than on legitimate business considerations. In support of her discrimination claim, she fails to identify relevant comparators. As to Statham, Walker, Purtee, and Pence, CSS persuasively argues that the circumstances of these employees were materially different: they occupied different positions within CSS, worked in different departments, were promoted to different positions (as to Statham, Walker, and Purtee), or received, along with the rest of the Charge Nurses, a "long overdue" raise (as to Pence). In response, Hawkins essentially contends that it is sufficient, for purposes of her *prima facie* case, that these employees where white, that they asked Watson for raises after taking on additional responsibilities, and that they received raises. Hawkins' position does not meaningfully address the context that CSS provided for the raises given to these four employees. Hawkins was not promoted (nor was she seeking a promotion), and she does not show why her circumstances are similar to those of the Charge Nurses as a whole.

This leaves only Patterson, the PRN who received a $1.00 raise at approximately the same time she took on the payroll functions that Hawkins had previously assumed. CSS persuasively argues that Patterson was not "similarly situated" to Hawkins because she was in the process of switching from probationary status to full-time status, entitling her to a discretionary $1.00 raise. Therefore, it is inappropriate to compare the small wage increase received by Patterson with the wage increase not received by Hawkins. Accordingly, the court finds that Hawkins has failed to make out a *prima facie* case of race discrimination.

Even if the court were to conclude that Hawkins could establish a *prima facie* case based on Patterson's wage increase alone, Hawkins has not presented evidence sufficient to rebut the

legitimate, non-discriminatory basis for CSS's actions in raising Patterson's salary. Hawkins requested a *$10.00* wage increase (approximately a 50% raise) for assuming certain additional responsibilities, whereas Patterson received only a small raise of $1.00 just after becoming a full-time employee and receiving limited additional responsibilities from Hawkins. Furthermore, although both Crow and Christiansen took on Hawkins' additional human resource responsibilities, neither received a raise for doing so. Taken in context, there is insufficient evidence from which the jury could conclude that giving Patterson an unremarkable $1.00 raise upon becoming a full-time employee somehow reflected racial animus by CSS against Hawkins in choosing to deny her a 50% raise.

### III. Retaliation Claims

#### A. Retaliation Standard

A claim for retaliation under Title VII based on circumstantial evidence is governed by the *McDonnell Douglas* burden-shifting framework. A plaintiff must first make out a *prima facie* case by showing that (1) she engaged in protected activity; (2) the employer knew of the protected activity; (3) an adverse employment action was subsequently taken against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). Once a plaintiff carries her *prima facie* burden, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for its adverse action. *Id.*; *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).

As a general matter, a plaintiff's *prima facie* burden, including the "causal connection" element, is a burden that is "easily met." *See Herrera v. Churchill McGee, LLC*, 2013 WL 6126150, at *3 (6th Cir. Nov. 21, 2013). Although the Sixth Circuit has not been entirely

consistent on this point, it has found that a short time period between the protected activity and the adverse action can be sufficient to establish the "causal connection" element. *Id.* (collecting cases); *Singfield*, 389 F.3d at 533 (three-month proximity sufficient); *Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006) (two months sufficient). Also, "the scope of Title VII's retaliation provision is broader than that of Title VII's discrimination provision." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006)). Thus, "[i]n contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that solely affect the terms, conditions or status of employment . . . ." *Hawkins*, 517 F.3d at 345. The retaliation provision, instead, protects employees from conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hawkins*, 517 F.3d at 347 (citing *Burlington N.*, 126 S. Ct. at 2412-14).

Ultimately, under Title VII, Hawkins must establish "but for" causation, which requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013). Also, as CSS points out, temporal proximity alone is insufficient to establish pretext. *See Ervin v. Honeywell Tech. Solutions*, 2013 WL 594747, at *11 (M.D. Tenn. Feb. 15, 2013) (citing *Donald v. Sybra*, 667 F.3d 757, 763 (6th Cir. 2012)).

Here, CSS does not dispute that Hawkins engaged in three forms of protected activity of which it was aware: (1) filing the First EEOC Charge; (2) filing the Second EEOC Charge; and (3) filing this lawsuit. Hawkins contends that CSS retaliated against her by taking specific actions relative to each of these three forms of protected activity. The court therefore will address each of these separately.

24

### B.  First EEOC Charge

#### 1.  *Prima Facie* Case

With respect to the First EEOC Charge, Hawkins claims CSS retaliated against her by issuing the ECR.  She points out that she was verbally counseled for her mistakes beginning just a few weeks after first complaining to the EEOC and received the ECR a few weeks thereafter. Hawkins also claims that, as to one of the incidents, Watson and Crow arguably were as culpable as she but were not disciplined.  She also claims that she self-reported and quickly addressed one of the mistakes and that the other mistake would not have occurred if CSS had simply called her on the month-end closing date (when she had taken a scheduled day off).  Finally, Hawkins contends that these were the only instances of workplace discipline she experienced at CSS.

Hawkins argues that these facts establish the requisite "causal connection."  Hawkins' *prima facie* burden to show a "causal connection" (the only disputed element relative to the First EEOC Charge) is relatively low.  In light of the close temporal proximity (between her First EEOC Charge and the disciplinary write-up) and these other factual circumstances, the court finds adequate evidence to support the requisite causal connection.  The burden therefore shifts to CSS to produce a legitimate, non-discriminatory reason for the ECR.

#### 2.  Legitimate Non-Discriminatory Reason and Pretext

CSS maintains that it counseled Hawkins for legitimate workplace errors and that Hawkins received the ECR after the errors accumulated and became more severe.  This position is supported by competent evidence: Hawkins admits that she made these mistakes, and testimony of multiple witnesses corroborates it.  Therefore, CSS has met its burden to produce evidence of a legitimate, non-discriminatory reason for the ECR, thereby shifting the burden back to Hawkins to show pretext under the applicable "but for" causation standard.

To show pretext, Hawkins must demonstrate by a preponderance of the evidence that CSS's proffered reasons are actually pretext for unlawful discrimination. *Brown v. Lexington-Fayette Urban Cnty. Gov't*, 549 F. App'x 366 (6th Cir. 2013) (citing *McDonnell Douglas*, 411 U.S. at 802, and *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003)). To demonstrate pretext and thereby defeat CSS's motion, Hawkins may show that CSS's reasons for issuing the ECR (1) had no basis in fact; (2) did not actually motivate CSS; or (3) were insufficient to explain its conduct. *Brown*, 549 F. App'x at 371 (citing *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009)). Ultimately, Hawkins must show that "the desire to retaliate was the but-for cause of the challenged employment action." *Bishop v. Ohio Dep't of Rehab. & Corrs.*, 529 F. App'x 685, 696 (6th Cir. 2013) (quoting *Nassar*, 133 S. Ct. at 2521).

With respect to the issue of pretext, Hawkins' opposition brief fails to acknowledge the *Nassar* standard and fails to explain her theory (or theories) of pretext. Unhelpfully, after reciting facts supporting the requisite causal connection, her brief simply states that "the very same quantum of evidence also supports the issue of pretext." Although evidence related to the causal connection can also support an inference of pretext, Hawkins should have argued something more here. Although it is not the court's duty to make Hawkins' arguments for her, the court will analyze the claims under the appropriate framework.

First, Hawkins cannot prevail on a "no basis in fact" theory of pretext, because she admits that she made the workplace errors referenced in the ECR.

Second, to show that CSS's reasons were "insufficient to motivate" its issuance of the ECR, Hawkins must show "circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008) (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th cir.

1994)).  To do so, the employee ordinarily must show by a preponderance of the evidence that other employees, particularly employees not in the protected class, were not subject to the same adverse action even though they engaged in "substantially identical conduct" to that which the employer contends motivated its discharge of the plaintiff.  *Blizzard v. Marion Tech. College*, 698 F.3d 275, 286-87 (6th Cir. 2012) (quoting *Manzer*, 29 F.3d at 1084).  Here, Hawkins has not identified any comparators with respect to this retaliation claim, meaning that she cannot prevail on this theory of pretext either.

Third, and finally, to show that CSS's stated reasons "did not actually motivate" it to issue the ECR, Hawkins must present "additional evidence" showing the employer was motivated by illegal reasons considering both the employer's stated reason and evidence the employer offers in support of such reasons."  *Manzer*, 29 F.3d at 1093.  "This argument is, essentially, that [the employer's] proffered reasons did not actually motivate" the adverse action. *Blizzard*, 698 F.3d at 287 n.6 (internal quotation and emphasis omitted).  "This method of proving pretext requires that the plaintiff admit the factual basis underlying the employer's explanation and further admit that such conduct could motivate dismissal."  *Blizzard*, 698 F.3d at 287 n.6 (internal quotation marks, citations, and brackets omitted).  The court finds insufficient evidence to support this theory of pretext.  Hawkins' supervisors testified that they agreed with the decision to discipline her, Hawkins admits that she made the referenced mistakes, and, in the absence of some indication that CSS did not employ best practices, it is self-evident that making errors on a month-end A/P closing is a serious error.  Furthermore, aside from receiving the ECR, Hawkins suffered no adverse consequences: she was not terminated, she was not suspended, she received a favorable performance review just a few weeks later, and she received a wage increase.  There is insufficient evidence from which a jury could conclude that, "but for"

a desire to retaliate against her, she would not have received the written counseling. From all indications, Hawkins simply created a "tempest in a teapot" relative to the ECR.

For these reasons, the court will dismiss Hawkins' claims for retaliation as they relate to the First EEOC Charge.

## C. Second EEOC Charge

As to the Second EEOC Charge, the court finds insufficient evidence to conclude that the "space heater" incident constituted a form of retaliation.[15] As an initial matter, although Hawkins' opposition brief references facts related to this incident in her factual summary, the argument section concerning her retaliation claims does not reference the incident. (*See* Docket No. 87 at pp. 20-24.) Thus, it is not clear whether Hawkins even maintains that the space heater incident constituted actionable retaliation in the first place.

Even giving her brief a generous construction, the court finds no grounds to conclude that removing the space heater constituted an "adverse action" for purposes of a retaliation claim, that there is a "causal connection" between the removal of the space heater and her Second EEOC Charge, or that the evidence can support a finding of pretext. First, a jury cannot credit Hawkins' speculation as to what Raymer told Watson after finding Hawkins' space heater; indeed, the record contains direct testimony from both Raymer and Watson about their discussion, based on their personal knowledge. Upon being told by Raymer that other employees also had non-compliant heaters, Watson immediately told Raymer to have those removed as well. As concerns the space heaters, the record therefore reflects no differential

---

[15] Hawkins cannot rely on vague and conclusory references to "petty forms of retaliation" to defeat summary judgment. The court's analysis focuses on the only specific example that Hawkins has articulated.

treatment of Hawkins relative to employees who had not filed EEOC charges. The court therefore finds no support for a causal connection. Furthermore, Hawkins has not shown that removal of Hawkins' admittedly non-complaint space heater constituted a type of "adverse" conduct that would dissuade a reasonable person from filing a charge of discrimination or retaliation. At best, the "adverse" conduct was isolated, exceedingly brief, and *de minimis*.

Finally, even if Watson could establish a *prima facie* case, CSS has offered a legitimate, non-retaliatory reason for removing the space heater: it did not comply with company policy. Again, Watson's brief provides no argument concerning the space heater incident, which approaches abandonment of the claim. Regardless, given that Watson asked Raymer to advise employees to remove all of the non-complaint space heaters (not just Watson's) after he told her that multiple employees had them, the court finds no basis on which a reasonable jury could conclude that her space heater would not have been removed "but for" CSS's alleged intent to retaliate against her for filing the Second EEOC Charge. Her assertion of a retaliation claim premised on this incident approaches frivolity.

For these reasons, the court therefore will dismiss Watson's retaliation claims as they relate to the Second EEOC Charge.[16]

### D. Retaliation Claims Premised on this Lawsuit

With respect to Hawkins' claims that she was retaliated against for filing this lawsuit, her claims are stronger.

---

[16] In her brief, Hawkins does not argue that her termination stemmed from filing her Second EEOC Charge, as opposed to her termination. The court therefore construes the retaliation claims relative to the Second EEOC Charge as relating only to the (unspecified) "petty complaints" and the "space heater" incident, which are insufficient for the reasons stated in this section.

With respect to her *prima facie* case, there is sufficient evidence of a "causal connection" between Hawkins' termination and the filing of this lawsuit. First, CSS terminated Hawkins within a few weeks of receiving service of process in this case, establishing a close temporal proximity between the protected activity and the adverse action. Second, CSS treated Hawkins differently than two white employees, Vickie Harrington and Joyce Cooper, whose then-existing roles were eliminated by the new system. Gonzalez flew from Texas to meet with Harrington and Cooper and offered them new positions, whereas no one from CSS or USPI spoke with Hawkins or offered her alternate employment at CSS.[17] Third, as noted in the fact section of this opinion, the actual basis for Hawkins' termination is genuinely debatable: Watson made representations in her letter (and in an affidavit in this case) that were not true, Ridgway made sworn representations about his knowledge concerning the circumstances of her termination that were not true, and there are numerous inconsistencies among USPI and CSS employees as to whether the A/P position or functions were "eliminated" and, if so, why.

As to pretext, CSS argues that it is beside the point to argue about whether Watson and Ridgway were actually correct in believing that Hawkins' position had been "eliminated," as long as they held an "honest belief" that the position would be eliminated at the time they sent Hawkins her termination letter on January 28, 2013. "[A]s along as an employer has an honest belief in its proffered non-discriminatory reason," the employee cannot establish pretext simply because the reason is ultimately shown to be incorrect." *Tillman v. Ohio Bell Tele. Co.*, 545 F.

---

[17] Gonzalez also testified that she met with a third white employee, Barbara Eib, whose position was affected by the new system. Eib is white, Gonzalez met with her individually, and Gonzalez offered Eib continued employment at CSS. Given the inconsistencies in the record, it is not entirely clear whether CSS will maintain at trial that Eib was affected by the transition (as Gonzalez claimed).

App'x 340, 349 (6th Cir. 2013) (quoting *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)).  When the "honest belief" rule is invoked, to establish pretext, "the plaintiff must allege more than a dispute over the facts upon which his discharge was based.  He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action."  *Braithwaite v. Timken Co.*, 258 F. 3d 488, 493-94 (6th Cir. 2001).  In determining whether a defendant had an "honest belief" in the proffered reason for a discharge, the court must determine whether the defendant has established a "reasonable reliance" on the particularized facts that were before it at the time the decision was made.  *Tillman*, 545 F. App'x at 349 (citing *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 502-503 (6th Cir. 2007)).  In determining whether an employer reasonably relied on the particularized facts before it, we do not require that the decisional process used by the employer "be optimal or that it left no stone unturned.  Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."  *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012).

Here, the court finds a genuine dispute of material fact as to whether the relevant decisionmakers, Ridgway and Watson, held an "honest belief" that Watson's position was being eliminated and that they "reasonably relied" on the facts presented to them at the time.  They made misrepresentations under oath earlier in this case on this precise issue, and they have given shifting explanations over time as to the circumstances of Hawkins' termination and their understanding of the impact of the new records system.  Furthermore, CSS offered jobs to Harrington and Cooper, whose jobs were impacted by the transition, but did not offer an alternate position to Hawkins.  Although CSS was certainly not required to provide Hawkins

31

another position, it has not given a consistent explanation as to why Hawkins was treated differently.  It will be for a jury to decide whether these inconsistencies simply reflected confusion between CSS and USPI about the potential impact of the switchover (at the time and, apparently, during the course of this case) or reflected a desire to retaliate against Hawkins for bringing this lawsuit.

## IV. **FMLA Interference Claim**

Under the FMLA, an eligible employee is entitled to as many as twelve weeks of leave during any twelve-month period for childbirth and care of a newborn.  29 U.S.C. § 2612(a)(1)(A).  Covered employers are prohibited from interfering with, restraining, or denying the exercise of their employees' rights.  29 U.S.C. § 2615(a)(1). Employees who return to work within the twelve-week statutory period are entitled to return to their previous position or an equivalent position.  *Id.* § 2614(a)(1).  Consequently, if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. *Arban W. Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).  "Because the relevant issue is whether the employer provided the employee with the entitlements provided by the FMLA, an employer may violate Section 2615(a)(1) regardless of the intent behind its conduct."  *Ritenour v. Tenn. Dep't of Human Servs.*, 497 F. App'x 521, 530 (6th Cir. 2012); *Arban*, 345 F.3d at 401. However, because the Sixth Circuit has recognized that the FMLA is not a strict liability statute, the mere occurrence of interference with an employee's FMLA rights is not a *per se* FMLA violation.  *Ritenour*, 497 F. App'x at 530.  "[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the same conduct."  *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).  Thus, "[a]n employee who requests FMLA leave would have no greater

protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request." *Arban*, 345 F.3d at 401. "An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Id.* "[A]n employer need not reinstate an employee who would have lost his job even if he had not taken FMLA leave . . . ." *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 408 (6th Cir. 2003).

A plaintiff may prove FMLA interference under the *McDonnell Douglas* burden-shifting framework. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014). The employee has the initial burden of establishing his *prima facie* case; if he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual. *Id.* To establish a *prima facie* case of FMLA interference, an employee must show that: (1) he was an eligible employee; (2) the defendant was a covered employer under the FMLA; (3) he was entitled to take leave under the FMLA; (4) he notified his employer of his intent to take leave; and (5) the employer denied him benefits or rights to which he was entitled under the FMLA. *Id.* Here, CSS contends that Hawkins cannot establish a *prima facie* case because her position would have been eliminated regardless of taking FMLA leave. However, as discussed in the previous section, CSS's positions concerning whether Hawkins' job was eliminated (sometimes CSS says it was, sometimes it says it was not) have been all over the map. This at least creates a genuine dispute of material fact as to whether Hawkins should have been able to be reinstated to her old position. Similarly, given that CSS offered Harrington and Cooper (and perhaps Eib as well) alternate positions at the company in light of the transition,

33

there is a genuine dispute of material fact as to whether they could or should have offered

Hawkins an "equivalent" position.

As with her retaliation claims, CSS argues that it had a legitimate reason for terminating

Hawkins: her job was eliminated. At best, this position only addresses whether Hawkins should

have been reinstated to her old position. It does not explain why Hawkins could not have

returned to an equivalent position at CSS, if one were available. Moreover, for essentially the

same reasons discussed relative to her surviving retaliation claim, there are genuine disputes of

fact concerning the actual motivation(s) behind Watson and Ridgway's decision to terminate

Hawkins. Thus, viewing the facts in the light most favorable to Hawkins, the court finds that

there are genuine disputes of fact concerning whether CSS's termination of Hawkins was

pretextual.

Hawkins contends that she is entitled to summary judgment on her FMLA interference

claim because, even viewing the facts in the light most favorable to CSS, CSS interfered with her

right to be reinstated to her former position or an equivalent position. As the court has

previously identified, there are genuine disputes of material fact concerning CSS's actual

motivations for terminating Hawkins and whether they were pretext for some type of unlawful

motive. Viewing the facts in the light most favorable to CSS, CSS may have terminated

Hawkins because it honestly believed that her position was being eliminated under the new

system or that, at a minimum, a full-time A/P position was no longer necessary and no equivalent

work was available to Hawkins. Thus, Hawkins is not entitled to summary judgment on her

FMLA interference claim.

In sum, Hawkins' FMLA interference claim will proceed to trial.

**V.** **After-Acquired Evidence Dispute**

In a footnote in its opening brief, CSS states that it will seek to assert an "after-acquired evidence defense" at trial related to Hawkins' alleged theft of confidential documents from CSS. CSS states that it is not moving for summary judgment on that basis but "reserves the right to obtain a ruling from the court" related to the defense. Hawkins responded to this argument and CSS replied. Hawkins has also filed a separate so-styled Motion to Strike CSS's assertion of an after-acquired evidence defense, which is not yet fully briefed. (Docket No. 100.) Given that CSS is not moving for summary judgment based on this asserted defense, the court will address this issue in a separate opinion.

## VI. Summary

Hawkins' discrimination claims, which relate to the July 2010 ECR, will be dismissed on the merits. Hawkins' retaliation claims related to the First and Second EEOC Charges will be dismissed on the merits. Hawkins' PDA claim will be dismissed for failure to exhaust administrative remedies. Hawkins' retaliation claims and FMLA interference claims related to her termination will proceed to trial.

## CONCLUSION

CSS's Renewed Motion for Summary Judgment will be granted in part and denied in part, and Hawkins' Partial Motion for Summary Judgment will be denied. As they relate to her 2013 termination only, Hawkins' retaliation claims and FMLA interference claims will proceed to trial. Hawkins' remaining claims will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge